ONE HUNDRED AND FIFTY-SIX PACKAGES OF TEA (UNITED STATES v.). See Case No. 15.933.

ONE HUNDRED AND FIFTY-THREE BARRELS OF DISTILLED SPIRITS (UNITED STATES v.). See Case No. 15,-934.

ONE HUNDRED AND FORTY BARRELS OF FLOUR (SPRAGUE v.). See Case No. 13,253.

ONE HUNDRED AND FORTY-SIX THOUSAND, SIX HUNDRED AND FIFTY CLAPBOARDS (UNITED STATES v.). See Case No. 15,935.

---

## Case No. 10,521.

### ONE HUNDRED AND NINETY-FOUR SHAWLS.

[1 Abb. Adm. 317;¹ 6 N. Y. Leg. Obs. 369.]

District Court, S. D. New York. July, 1848.

ADMIRALTY—SUITS BETWEEN FOREIGNERS—SALVAGE.

1. It rests in the discretion of a court of admiralty whose aid is invoked to the settlement of a controversy between foreigners. to hear and determine it, or to remit the parties to their home forum.

[Cited in The Maggie Hammond v. Morland, 9 Wall. (76 U. S.) 450; The Carolina, 14 Fed. 426.]

2. There is no authority of weight which imposes on the courts of our own country the necessity of determining controversies between foreigners resident abroad, either in common-law proceedings, transitory in their nature, or in maritime suits prosecuted in rem.

[Cited in The Belgenland, 114 U. S. 365, 5 Sup. Ct. 864.]

3. As a general rule, where the only question in a salvage suit is as to the rate of reward. and the salved property is within the jurisdiction of

---

¹ [Reported by Abbott Bros.]

the court, a court of admiralty, in this country, will entertain the suit. notwithstanding that all the parties are foreigners.

[Cited in Studley v. Baker, Case No. 13,559.]

4. It seems, that when in a salvage suit between foreigners, the answer charges the libellant with wanton misconduct in obtaining possession of the property, and prays the privilege to contest the claim of the libellant before the courts of their common country. the case should be dismissed to the home forum.

5. What considerations will govern a court of admiralty in determining to exercise or decline jurisdiction of a suit between foreigners.

[Cited in The Russia. Case No. 12,168; Bernhard v. Creene, Id. 1,349.]

This was a libel in rem, filed by Thomas Crowell and others, the owner, master, and crew of the bark Reliance, against one hundred and ninety-four shawls, and certain other articles salved by the libellants from the wreck of the Lady Kenneway, to recover salvage compensation. The Reliance was a British vessel, owned in Liverpool. The libellants were all of them British subjects and residents, and the crew of the bark were all shipped for the voyage during which the salvage for which compensation was now claimed was effected, under British articles. The leading circumstances upon which the claim to salvage compensation was based. were, according to the statements of the libel as follows: The bark Reliance left Liverpool on November 1, 1847, bound to New York, and ultimately back to Liverpool—having a crew of nineteen men and five boys, and being laden with a cargo of iron and salt, and having on board, also, about 280 passengers. On the 16th of November she fell in with the Lady Kenneway, as alleged in the libel, in latitude 44° 54', and longitude 9° 54', on soundings, near the coast of England, and boarded her at mid-day. The wind was light, and the weather. at the time, mild. No person was found on board. The rudder of the Lady Kenneway was gone, and she had five feet water in her hold, but otherwise she appeared staunch and sound. Another British brig was found lying off near her at the time, and a boat's crew from that vessel came on board whilst the libellants were there, and took away a boat load of her cargo, but refused to give the name of their vessel. The Lady Kenneway was a British East Indiaman. She was owned in London, and was on a voyage from Bombay to London, laden with a cargo of shawls, silks, coffee, rice, and arrowroot. The mate of the Reliance offered to take the Lady Kenneway into port, with the aid of a small crew, but the master of the Reliance considered that it was not advisable to attempt her salvage with his own vessel or crew, and ordered to be taken from her to his vessel several cases, which were found to contain 194 shawls; there were also so taken some pieces of silk. portions of the sails of the vessel, of her tackle, provisions, and ship's stores. &c. After being engaged in that service three or

four hours, the libellants abandoned the vessel, leaving the British brig near her, and continued their voyage to New York, where they arrived on December 1, 1847. The Lady Kenneway was subsequently taken into Portsmouth, England, but who were the salvors did not appear upon the proofs in this case.

On the 22d of December, the first libel was filed in this court against the chief part of the articles brought from the Lady Kenneway; on the 24th a supplemental bill was filed, specifying various other articles omitted in the first. On the 30th of November, the British consul, by leave of the court, intervened in behalf of the unknown British owners, praying the court to order restitution for their benefit of the property attached, after allowing the libellants a reasonable salvage, if, in the judgment of the court, "they proved a case of derelict, and their consequent right to salvage." On January 3, 1848, an appearance and claim was entered in behalf of Arbuthnot, Evart & Co., of Liverpool, for forty shawls, parcel of the one hundred and ninety-four taken out of the Lady Kenneway. On March 28, 1848, Frith, Sands & Co., of Liverpool, by leave of the court. filed their claim to sixty-six of said shawls; and on June 8, 1848, John Bibby & Sons, of Liverpool, in like manner filed their claim to fifty-one of said shawls. No claims were interposed by owners for the residue of the property under attachment in the suit.

The individual claimants, as well as the consul, set up defences against the award of salvage, charging that the libellants embezzled portions of the goods taken out of the Lady Kenneway, and committed waste, damage, and destruction of the apparel and stores of the vessel whilst on board of her. The claims and answers also insisted that the libellants had no rightful authority, under the circumstances, to remove from the vessel the portion of her cargo taken away. The answers and claims of Frith, Sands & Co., and of John Bibby & Sons, furthermore insisted that the court should decline jurisdiction in the case, because the Lady Kenneway was an English vessel, then on a homeward voyage, with her cargo for an English market, and the Reliance, at the time, was an English vessel, with a British crew on board, who had signed British articles, and that accordingly both vessel and libellants were bound to return to terminate the voyage at a British port.

On March 7, 1848, an action by the United States against the master of the Reliance, for a penalty of $400, for landing in this port some of the said shawls without a permit, was tried in this court; and on the 22d of March a like action against the carpenter of the vessel for a like offence, was also tried, and by written stipulation between the proctors of the libellants and of the claimants, the testimony given on those trials was received as part of the proofs in this cause.

Each of the parties, also, put in voluminous documentary proofs upon the issues involved.

Phillip Hamilton and W. Q. Morton, for libellants.

Charles Edwards, for claimants.

BETTS, District Judge. An objection is taken by the claimants to the mode of proceeding adopted in this cause, which is deemed by them to be of great importance in its bearing upon the merits; as is also the omission in the original and supplemental libel of any averment that the master of the Reliance entered in his log a full specification of the articles taken by him from the Lady Kenneway. The conclusion to which the court has arrived upon another branch of the defence will, however, render it unnecessary to consider those points.

I have carefully examined all the proofs in the cause, as well those taken originally in this action as those introduced by stipulation from the suits prosecuted on behalf of the United States, in order that I might satisfy my mind whether the libellants had established a case of manifest justice on their part; and whether the property under arrest was so circumstanced as to render it important to all interested in it, that this court should determine to what extent it was chargeable in behalf of the libellants; or whether, in order to insure the ultimate realization of its value to those concerned, it was advisable that the court should decree its sale; for I regard it as resting in the sound discretion of the court, on all the facts and circumstances of the case, to exercise or decline jurisdiction over the property arrested.

As a general principle, the citizens or subjects of the same nation have no right to invoke a foreign tribunal to adjudicate between them, as to matters of tort or contract solely affecting themselves. It rests in the discretion of the court, whose authority is invoked, to determine whether it will take cognizance of such matters or not.[2] Rea v. Hayden, 3 Mass. 24; Gardner v. Thomas, 14 Johns. 134; Johnson v. Dalton, 1 Cow. 548; The Courtney, Edw. Adm. 239; The Madonna, 1 Dod. 37. The last two cases in admiralty proceed upon the same doctrine, although maritime courts will probably exercise a discretion in support of actions between foreigners, upon a broader view of collateral equities than would be entertained by courts of law. The Jerusalem [Case No. 7,293].

As maritime courts proceed upon a common rule of right and compensation in salvage cases, the question of jurisdiction in that class of actions will seldom be raised or regarded before them.

The courts will take cognizance of those

---

[2] See, also, upon the subject of jurisdiction over foreigners, the case of Davis v. Leslie [Case No. 3,639]: The Infanta [Id. 7,030]; and Bucker v. Klorkgeter [Id. 2,083], decided in January, 1849.

cases as matters of course, if either party is territorially within the jurisdiction of the court; and the property being brought within their jurisdiction, although the salvors and claimants may be citizens or subjects of different nations, the court will unhesitatingly dispose of the subject, if satisfied that the whole right is before it,—salvage being essentially a question of the jus gentium. The Two Friends, 1 C. Rob. Adm. 271; The Blaireau, 2 Cranch [6 U. S.] 248.

In The Jerusalem [supra], Judge Story maintains strenuously the propriety of admiralty courts taking cognizance, it would seem, of all actions in rem, although foreigners are solely interested, whenever the situs rei under contestation is found within their territorial authority. But his reasoning still moves within the qualification that the court, having the legal capacity to adjudicate in such matters, is not bound to remit them to the forum of the litigant parties. Guarded by that limitation, the rule may be serviceable to the navigation and intercourse of commercial nations, and be of convenient and wholesome application.

I find no authority of weight which imposes on the courts of our country the necessity of determining controversies between foreigners resident abroad, either in common-law actions, transitory in their nature, or maritime proceedings when the remedy is in rem. If the doctrine were peremptory, imparting to suitors the right to such aid, and imposing on courts the obligation to afford it, actions for supplies and materials, on charter-parties and bills of lading, or by mechanics for labor, would be comprehended within the class, equally with suits for wages on bottomry bonds or for salvage compensation.

I am satisfied the law is not so. In my judgment it would be lamentable if courts were compelled to defer the business of the citizens of the country to bestow their time on litigations between parties owing no allegiance to its laws, and contributing in no way to its support.

Should it transpire, in the progress of the litigation, that the law of the domicile of the parties must be ascertained in order to adjudge rightly on their claims, or that witnesses must be examined there to fix the facts in controversy, the court might be compelled to suspend its movement, and wait until these cardinal particulars could be supplied from abroad. Every tribunal experiences the inconvenience and unsatisfactoriness of so settling controversies between those even who can have no other means of redress, and will recognize the value of the principle which enables them, in regard to foreigners, to remit their controversies to their home tribunals, where the law is known, and the facts can be more surely determined.

This court has, in repeated instances, acted upon this acceptation of the law; and believing it to be the sound and safe rule, I

shall adhere to it in all cases authorizing that exercise of discretion.

The question to be considered is, whether, in this case, the rights of parties would be best promoted by retaining the case and disposing of the subject here, or by remitting it to the home courts of the salvors and claimants.

The answer advances many grave imputations against the conduct of the master and seamen on board the wreck, and after the property came into their possession, and these charges are not without color of proof to support them. Their case does not, accordingly, come before the court with the most persuasive claims to its interposition and favor. When salvage services are eminently meritorious, and the only inquiry to be made is the rate of reward to be allotted, admiralty courts would be solicitous to give every practicable dispatch to. suits by the salvors, and relieve them both from delay and expense in obtaining their just reward. It would scarcely occur that any court would withhold its aid from such suitors.

It is quite different when the foreign owner of the property charges his fellow-subject with embezzlement and spoliation, and other wanton misconduct in respect to it, and prays the privilege to contest his claim to compensation before the authorities of their common country.

Independent of that aspect of this case, it is attended by other particulars most proper to be inquired into and adjudicated by an English court, and which could hardly be fitly appreciated or justly disposed of by a foreign one. There are several of these particulars:

1. The application and effect of certain provisions in two acts of parliament in relation to salvage services.

The claimants supposed this transaction within the provisions of the act of 1 & 2 Geo. IV., c. 75, and that the master of the Reliance had acted in direct violation of section 13 of that statute.

It had escaped the notice of the advocates that the acts of 9 & 10 Vict. c. 99, § 2, repeals the former statute. The latter act has been closely criticized by English writers, because of its unskilful and somewhat confused enactments (Law Mag., Feb., 1847, art. 2); yet section 30 would seem, notwithstanding, to embody substantially the provisions of section 13 of the act of 1 & 2 Geo. IV. At all events, it more appropriately belongs to the English judiciary to settle its meaning, and determine whether the master of the Reliance has acted in violation of the directions of the statute; as also what were his obligations by the local law, under the circumstances, in regard to the wrecked vessel or her cargo.

If that statute applies to this transaction, then there is a further and urgent reason for referring the whole matter to the English courts, because the master would, by the provisions of the act, be subject to a penalty

of £100, and double the value of the goods taken by him, for failing, on the return of his vessel, to bring before the commissioner of salvage or the high court of admiralty, the property removed from the Lady Kenneway.

2. The Lady Kenneway was, shortly after the libellants left her, saved and taken into England. Most intimately, if not necessarily, connected with the manner and merit of the salvage of the vessel and the appropriate reward for it, must be that also of the salvage of the cargo, whether made by one or different sets of salvors. The Emma, 2 W. Rob. Adm. 315.

3. The termination of the voyage of the Reliance was in England, where it is to be presumed she would arrive within a short period after leaving this port, and it is most fitting that the question of the obligations and privileges of her master and crew, in respect to services rendered a British vessel, a wreck or in distress on the English coast, should be determined in the courts of that nation.

4. The shawls taken from the wreck were of great price, composing the chief value of all the property removed to the Reliance. It was found on the trials before referred to, that these articles were essentially adapted to the English and European market, and were comparatively unsalable in the American market. They were transshipped from a vessel bound to London, and near her destination, and it is a question of deep import, which cannot be evaded in the decision of the cause, whether the conduct of the master of the Reliance, in transporting such a cargo, situated as he found this, to a distance so remote from its proper and available market, was excusable; and even if excusable in law, whether he can found upon it a claim to remuneration as for a meritorious salvage.

Not only is this question itself more suitably addressed to the consideration of an English than an American court, but an ingredient for its just disposition not in the case before me, must necessarily be brought to the attention of the tribunals there—the actual condition of the Lady Kenneway at the time, and the facility or delay the Reliance would have incurred in saving her, in the estimation of her salvors, or of persons who visited her after she had been deserted.

Other particulars in the case, of no unimportant influence, might also be referred to, but enough have been stated to satisfy my judgment that the exercise of a sound discretion requires me to dismiss this prosecution, and remit the property and cause to the proper forum in Great Britain.

A decree will accordingly be entered, discharging the property from arrest, each party to pay his own costs in this court, except that in respect to the British consul, who intervened officially in protection of the rights of absent and unknown owners, his taxable costs are to be paid before the order

for delivering up the property is executed. It will be manifest from the face of the order, that the payment of these costs is compulsory, and by authority of the court having possession of the property, and as a condition to its surrender; and it will doubtless be a document which may avail in evidence before the British tribunals, and be there regarded in the final award of compensation and costs between the libellants and the owners of the property.

I regret that other engagements in the circuit court, and in the business before this court having precedence of this cause, have delayed the disposal of the case much beyond the period usual in these courts, after a hearing is completed. But as the property is not in its nature perishable, it is presumable that no other consequence has resulted from a delay of six weeks, than an inconvenience to the parties: to the one in having the reward they may be entitled to deferred, and to the other in losing for the time the use or proceeds of the property.

As the libellants may not reclaim the property attached in their behalf, the decree will make provision enabling the claimants who have intervened in their own right, and the British consul in behalf of unknown owners, to take the goods out of court and ship them to their port of destination.

Decree accordingly.